IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
CHRISTIAN MCNIFF,                      )
                                       )
              Plaintiff,               )
                                       )
v.                                     )      Civil Action No. 1:18cv1411 (LO/JFA)
                                       )
NANCY A. BERRYHILL, Acting             )
Commissioner of Social Security,       )
                                       )
              Defendant.               )
_____)
```

## REPORT AND RECOMMENDATION

This matter is before the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment. (Docket nos. 11, 15). Pursuant to 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final decision the Acting Commissioner of the Social Security Administration ("Commissioner"), denying plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The Commissioner's final decision is based on a finding by the Administrative Law Judge ("ALJ") and Appeals Council for the Office of Disability Adjudication and Review ("Appeals Council") that as of November 27, 2017, plaintiff was not disabled as defined by the Social Security Act and applicable regulations.[1]

On March 29, 2019, plaintiff filed a motion for summary judgment (Docket no. 11) and brief in support (Docket no. 12), and he waived oral argument (Docket no. 13). On April 23, 2019, the Commissioner filed a memorandum in opposition to plaintiff's motion for summary

---

[1] The Administrative Record ("AR") in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C). (Docket no. 8). In accordance with those rules, this report and recommendation excludes any personal identifiers such as plaintiff's social security number and date of birth (except for the year of birth), and the discussion of plaintiff's medical information is limited to the extent necessary to analyze the case.

judgment (Docket no. 14) as well as a cross-motion for summary judgment (Docket no. 15) and a memorandum in support that is identical to the Commissioner's opposition to plaintiff's motion for summary judgment (Docket no. 16). The Commissioner also waived oral argument. (Docket no. 17). Plaintiff filed a reply in opposition to the Commissioner's motion for summary judgment on May 13, 2019. (Docket no. 18). For the reasons set forth below, the undersigned recommends that plaintiff's motion for summary judgment be denied, the Commissioner's motion for summary judgment be granted, and the Commissioner's final decision be affirmed.

## I.   PROCEDURAL BACKGROUND

On October 3, 2014, nineteen days before applying for DIB, plaintiff signed an "Appointment of Representative" form authorizing Andrew Mathis to represent him on plaintiff's behalf with respect to "claim(s) or asserted right(s) under: Title II (RSDI) [and] Title XVI (SSI)." (AR 107). Plaintiff applied for DIB on October 22, 2014 with an alleged onset date of August 19, 2013. (AR 191-92). On February 18, 2015, as part of the disability determination at the initial level, Howard S. Leizer, Ph.D., a state agency psychologist, found that, in addition to a severe spine disorder, plaintiff had non-severe ADD/ADHD and a non-severe anxiety disorder. (AR 84-85). He opined that plaintiff had a mild restriction in activities of daily living and mild difficulties in maintaining concentration, persistence, or pace. (*Id.*). Overall, the disability determination indicated that, while one or more of those impairments could be expected to produce plaintiff's pain or symptoms, the objective medical evidence alone did not support plaintiff's statements about the intensity, persistence, and functionally limiting effects of the symptoms, and deemed plaintiff's statements partially credible. (AR 85). Ultimately, the report concluded that plaintiff was not disabled. (AR 88). It explained that his condition was not severe enough to keep him from working, and that he could adjust to other work. (AR 88-89).

2

The Social Security Administration then denied plaintiff's DIB application, stating that plaintiff was "not disabled under our rules." (AR 108, 114).

On March 5, 2015, plaintiff filed a request for reconsideration for Social Security benefits because he was unable to engage in substantial gainful activity. (AR 119). Plaintiff did not submit additional evidence. (*Id.*). On July 13, 2015, in response to plaintiff's request for reconsideration, Julie Jennings, Ph.D., a state agency psychologist, found that plaintiff had a severe spine disorder, severe ADD/ADHD, and a severe anxiety disorder. (AR 97-98). Dr. Jennings opined that plaintiff had mild restrictions in activities of daily living and moderate difficulties in maintaining concentration, persistence, and pace. (AR 98, 101). Like the initial report, the report on reconsideration concluded that, while one or more of plaintiff's medically determinable impairments could reasonably be expected to produce plaintiff's pain or other symptoms, his statements about the intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by the objective medical evidence alone, and plaintiff's statements were deemed partially credible. (AR 99). The credibility assessment as to plaintiff's mental allegations noted that despite significant complaints to providers, the evidence shows plaintiff quit work on his own terms to start his own business running a website selling ice hockey memorabilia, that his cognitive screens have been within normal limits, and ADLs are not severely limited. (*Id.*).

Regarding sustained concentration and persistence limitations, Dr. Jennings found moderate limitations in plaintiff's ability to carry out detailed instructions and to maintain attention and concentration for extended periods. (AR 101-02). She also found him moderately limited in his ability to complete a normal workday and work week without interruptions from his psychologically based symptoms and to perform at a consistent pace without an unreasonable

number and length of rest periods based on plaintiff's reported attention/concentration difficulties, indecisiveness, and restlessness. (AR 102). However, she noted that plaintiff "demonstrated superior performance on working memory tasks and intact performance on executive functioning tasks" and found that plaintiff "would be limited to simple, unskilled, non-stressful work as a result of his ADHD symptoms and anxiety." (AR 102). The report concluded that plaintiff was not disabled because his "condition is not severe enough to keep [him] from working" and that he could adjust to other work. (AR 103-04). The Social Security Administration denied plaintiff's DIB application because the initial determination "was proper under the law." (AR 120, 124).

On August 10, 2015, plaintiff requested a hearing before an ALJ. (AR 127-28). Plaintiff indicated that he was submitting additional evidence with the request. (AR 127). On September 2, 2015, the Office of Disability and Adjudication Review ("ODAR") acknowledged plaintiff's request for a hearing (AR 129-142), which it later scheduled for May 8, 2017 (AR 143-87). The ALJ held the hearing as scheduled. (AR 39-78). During the hearing, plaintiff provided testimony and answered questions posed by the ALJ and plaintiff's representative. (AR 41-73). A vocational expert also answered questions posed by the ALJ and plaintiff's representative. (AR 73-78). On August 31, 2017, more than three months after the hearing before the ALJ, plaintiff submitted twenty-five pages of medical records from Integrated Neurology Services covering the period of May 26, 2016 through November 19, 2016. (AR 23).

On November 27, 2017, the ALJ issued a decision denying plaintiff's claim and finding that plaintiff had not been under a disability within the meaning of the Social Security Act from the alleged onset date of August 19, 2013 through the date of the decision. (AR 20-34). The ALJ did not accept the twenty-five pages of medical records from Integrated Neurology Services

4

into the record because it was not filed timely, and plaintiff did not demonstrate an exception to the rules regarding the submission of evidence before the hearing.  (AR 23).  Nevertheless, the ALJ did review those records indicating that they concerned issues with intermittent neuropathy, chronic left L-5 radiculopathy, and sleep apnea, and stated that the information in those records was consistent with the other medical records and the disposition of the case.  (*Id.*).

On January 3, 2018, plaintiff filed a request to review the ALJ's decision with the Appeals Council, arguing that the ALJ's decision was not supported by substantial evidence and "[t]he ALJ failed to give appropriate consideration and to perform the evaluations mandated by the regulations, rulings, and circuit case law with regard to the issues of credibility of subjective complaints and opinion of treating physicians."  (AR 188-90).  Plaintiff also submitted a neuropsychological evaluation, completed on March 19, 2018, "as new and material evidence."  (AR 7-16).  On April 16, 2018, plaintiff submitted a brief in support of his request for Appeals Council review.  (AR 284-89).  The Appeals Council denied plaintiff's request for review on September 19, 2018 finding no reason under it rules to review the ALJ decision.  (AR 1-5).  In its decision, the Appeals Council specifically found that the neuropsychological evaluation submitted as additional evidence did not show a reasonable probability that it would change the outcome of the decision.  (AR 2).  As a result, the ALJ's decision became the final decision of the Commissioner.  *See* 20 C.F.R. § 404.981.  As stated in the "Notice of Appeals Council Action," plaintiff was given sixty days to file a civil action challenging the decision.  (AR 2).

On November 14, 2018, plaintiff timely filed this civil action seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  (Docket no. 1).  On February 26, 2019, the District Judge entered an order granting defendant's consent motion to set the summary judgment briefing schedule.  (Docket nos. 5, 6).  This case is now before the

undersigned for a report and recommendation on the parties' cross-motions for summary judgment.  (Docket nos. 11, 15).

## I.   STANDARD OF REVIEW

Under the Social Security Act, the court will affirm the Commissioner's final decision "when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  It is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).  In determining whether a decision is supported by substantial evidence, the court does not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro*, 270 F.3d at 176 (alteration in original) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).  The duty to resolve conflicts in the evidence rests with the ALJ, not the reviewing court, and the ALJ's decision must be sustained if it is supported by substantial evidence. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

## II.   FACTUAL BACKGROUND

### A.   Plaintiff's Age, Education, and Employment History

Plaintiff was born in 1973 and was forty-four years old at the time of the hearing on May 8, 2017.  (AR 42-43).  Plaintiff completed high school and one year of college.  (AR 43, 215). Plaintiff worked as a mechanic at Midas from January 1995 through March 2000, as an assistant manager at Aerolink from 2000 through 2003, and as a salesman and manager at Fairfax Auto Parts from August 2003 through August 2013.  (AR 44, 204-205, 216, 232-235).  At the hearing,

6

plaintiff stated that he has not worked since 2013 but helps his son sell trading cards online.[2] (AR 46-48).

**B.      Summary of Plaintiff's Medical History Prior to Alleged Disability Date[3]**

Prior to his alleged disability date, plaintiff had a history of gastroesophageal reflux disease (GERD), hypercholesterolemia, alcoholism, spondylolisthesis, and tobacco dependence. (AR 398).  He reported quitting using tobacco in 2008 or 2009, and alcohol in 2010.  (AR 400, 556).  Plaintiff was involved in two motor vehicle accidents between 1996 and 2002, both of which he states resulted in concussions.  (AR 555).  A brain MRI taken in April 2007 showed normal findings.  (AR 400).  Plaintiff underwent a fusion of the posterior lumbar spine (L4-S1) on November 26, 2008.  (AR 455).

Plaintiff first visited Humaira Siddiqi, M.D., a psychiatrist with Kaiser Permanente, on October 8, 2012 due to concerns about his mood and anxiety.  (AR 325).  He reported that his medication, Atomoxetine, was "really great" but that he had become moody, and that he had "terminal insomnia and frequent wakings at night," an inability to fall fully back asleep, and irritability.  (*Id.*).  He denied any suicidal ideations.  (*Id.*).  Dr. Siddiqi observed that plaintiff was awake and alert at that visit with an intact attention span and concentration, and that his memory was grossly intact.  (AR 326).  His thinking process was goal directed, linear, and organized; he had intact reality; and he was intellectually average with good insight and judgment.  (*Id.*).  His depression screening questionnaire indicated that plaintiff's depression symptoms made it

---

[2] Plaintiff's medical records, disability report, work history report, and testimony during the hearing have conflicting information about his tenure at Aerolink Transportation JV ("Aerolink") as well as his possible self-employment after the alleged onset date.  (AR 43-44, 204-05, 216, 232, 410, 495, 647).  The ALJ addressed this issue at the hearing (AR 43-48) and discussed this lack of clarity in her opinion (AR 26).  However, because the ALJ found that plaintiff was not disabled for the entire period at issue, that uncertainty was not dispositive.  (*Id.*).  The undersigned recommends that the court uphold the Commissioner's decision and does not address that issue.

[3] The Administrative Record contains over 600 pages of medical records from various sources relating to plaintiff's medical treatments.  This summary provides an overview of plaintiff's medical treatments and conditions relevant to his claims and is not intended to be an exhaustive list of each and every medical treatment.

somewhat difficult to "work, tend to things at home, or get along with others." (AR 327). Dr. Siddiqi advised plaintiff against using cannabis because it could exacerbate mood symptoms and spoke with plaintiff about sleep hygiene, reducing photo stimulation, and engaging in stress-reducing activities. (AR 326). She also prescribed Mirtazapine to be taken at bedtime. (AR 327). Following this 20-minute session, Dr. Siddiqi's primary diagnosis was generalized anxiety disorder and ADHD. (AR 325-26). They scheduled a follow-up appointment for December 10, 2012. (AR 326).

During plaintiff's visit with Dr. Siddiqi on December 10, 2012, he reported that his sleep had improved and that he awoke rested, but that he felt disconnected due to his current Mirtazapine dosage. (AR 331). He had stopped all medication except Strattera and Lovastatin, and he stated that the Strattera was working well. (*Id.*). He had an intact memory and attention span, he was awake and alert, and he was intellectually average with good insight and judgment. (AR 332). The results of the depression screening questionnaire revealed no severe depression. (AR 332-33). The diagnosis following this 20-minute session was ADHD, generalized anxiety disorder, and insomnia. (AR 331-32). Plaintiff was again advised to discontinue using cannabis and plaintiff was instructed to see her again in three months and to message her in two weeks. (AR 333).[4]

### C.   Summary of Plaintiff's Medical History Following Alleged Disability Date

Plaintiff was involved in a car accident on August 19, 2013. (AR 532). On August 21, 2013, plaintiff saw Marie Hyunh, M.D., a doctor with Kaiser Permanente's Internal Medicine Department, and stated that he was not experiencing head trauma or a loss of consciousness as a result of that accident. (AR 532). The reason listed for this visit was back pain and the

---

[4] There are no records of any follow-up treatment with Dr. Siddiqi until February 28, 2014, over 14 months later. (AR 336).

diagnoses following the examination included strain of lumbar region and a shoulder strain, trapezius muscle.[5] (*Id.*). On September 6 and 9, 2013, during visits at Kaiser Permanente regarding back pain flare ups, the records reflect plaintiff was not having headaches or visual complaints, he was not experiencing any change in his neurological function, and that he was alert and oriented with clear speech. (AR 419, 421, 523-24).[6]

On January 31, 2014, plaintiff visited an urgent care facility due to "feeling worthless and spontaneous episodes of crying" but denied any suicidal or homicidal ideations. (AR 412). Angeline Haung, M.D., recorded that plaintiff had mentioned to his wife that he was suicidal but refused to go the emergency room. (AR 413). Plaintiff's wife reported that he had been blacking out and experiencing memory loss since July 2013, and plaintiff reported hearing ringing and having occasional hot flashes, chest pains, and tingling sensations. (*Id.*). Plaintiff was transferred to the Virginia Hospital Center Emergency Room, where he was seen by James Cogbill, M.D., and Jeffrey Kin, M.D. (AR 300, 414). Plaintiff complained to Dr. Cogbill of one to two months of moderate, intermittent generalized confusion, causing him to feel "depressed and 'not normal.'" (AR 300, 413-14). He was not found to be suicidal and was treated for confusion and difficulty remembering. (AR 414). His wife reported that plaintiff sometimes had difficulty remembering things, which plaintiff attributed to his recent increased dosage of Strattera. (AR 300). He also complained of headaches and tinnitus over the last six to seven months resulting from a motor vehicle accident. (*Id.*). He received a head CT scan that revealed "[f]ocal low attenuation in the right occipital region." (AR 543-44). Dr. Cogbill discussed

---

[5] Dr. Hyunh did not diagnose plaintiff with a concussion at that visit, but a later neuropsychological evaluation stated that plaintiff reported that a "concussion occurred in 2013 during a motor vehicle accident where he hit the side window and experienced a loss of consciousness for approximately one minute." (AR 555).

[6] As discussed below, the issues raised by the plaintiff in this matter focus on his mental residual functional capacity and not his physical functional capacity. Accordingly, this report and recommendation will not discuss in detail the various treatments relating to plaintiff's back condition.

plaintiff's complaints and examination with neurology and determined that the questionable CT finding could be addressed through an outpatient MRI and EEG. (AR 300, 414). Dr. Kin secured the first available appointment for plaintiff to see Harman Bajwa, M.D., a doctor with Kaiser Permanente's Neurology Department, which was scheduled for February 3, 2014. (AR 301, 310, 414). During plaintiff's visit, Dr. Cogbill called Shweta Verma, M.D., a psychiatrist with Kaiser Permanente, regarding plaintiff's complaints and the results of the head CT. (AR 386). Dr. Verma recommended decreasing plaintiff's dose of Strattera and that plaintiff follow-up with Dr. Siddiqi. (*Id.*). Dr. Cogbill decreased that dosage, diagnosed plaintiff with post-concussion syndrome, and discharged him in stable condition. (AR 300, 301, 310).

Plaintiff met with Dr. Bajwa on February 3, 2014 pursuant to Dr. Kin's referral. (AR 410). In a letter to Dr. Kin, Dr. Bajwa reviewed plaintiff's memory complaints and noted that plaintiff had not had any further episodes since being off Strattera and remained independent in his activities of daily living. (AR 410-12, 494-95). Plaintiff's mental status was intact, no associated headaches or loss of vision, and his neurological examination was non-lateralizing. (AR 410-12, 496-97). Dr. Bajwa requested a brain MRI, serologies, and a baseline EEG. (AR 412, 497). On February 6, 2014, Roderick Starkie, D.O., also a doctor with Kaiser Permanente's Neurology Department, informed plaintiff that his EEG was normal. (AR 409-10, 492-93). Plaintiff received an MRI on February 11, 2014 but had difficulty lying still, so the resolution of the images were degraded. (AR 408-09, 429, 540-41). Other than "a few T2 hyperintensities in the supratentorial brain, likely of no clinical significance," the results of the MRI were normal. (AR 429-30, 541).

Plaintiff saw Dr. Siddiqi again on February 28, 2014. (AR 336). He reported that he had stopped taking Strattera and Mirtazapine after experiencing irritability and blackouts, in part

because he believed he may have doubled the dosage due to these blackouts. (*Id.*). He also reported having memory problems and poor focus for several years following two motor vehicle accidents, both of which he states resulted in a concussion. (*Id.*). He complained of "ringing in his ears" as well as "severe anxiety, worry, catastrophic thinking, [and] muscle tension." (*Id.*). Plaintiff complained of vertebral damage and pain and was unsure whether this damage was affecting his cognition and memory. (*Id.*). They discussed neuropsychological testing. (*Id.*). Plaintiff denied mood cycling or psychotic symptoms and was alert and cooperative, but he had "[s]omewhat impaired attention" with frequent zoning out, though Dr. Siddiqi did not formally test his cognition. (AR 336-37). Dr. Siddiqi advised plaintiff to stop taking Strattera and Remeron. (AR 336). The depression screening questionnaire revealed severe depression. (AR 338). They discussed starting new medications for sleep, and plaintiff was instructed to see an ENT and to follow-up with Dr. Siddiqi on March 24, 2014. (AR 336-37).

During his March 24, 2014 visit with Dr. Siddiqi, plaintiff reported diminished anxiety, fewer angry outbursts, and improved frustration tolerance, though he felt "transient panic from situational stressor[s]." (AR 392). Dr. Siddiqi advised plaintiff to increase his Lexapro prescription and to use Xanax in the short term for his anxiety. (*Id.*). Plaintiff was alert, logical, and calm, and Dr. Siddiqi observed that plaintiff had "adequate appearing cognition," but she did not perform formal testing. (*Id.*). Dr. Siddiqi instructed plaintiff to follow-up with her in two months. (AR 393). Plaintiff's depression screening questionnaire indicated that his depression had improved from severe on February 28, 2014 to moderate. (AR 394).

On April 7, 2014, Dr. Siddiqi completed a disability determination services questionnaire. (AR 321-24). Dr. Siddiqi reported that she had seen plaintiff once annually beginning on October 8, 2012, and that plaintiff had "chronic insomnia, poor cognition, slowed

11

processing, anger, depression and . . . panic episodes" for several years.[7]  (AR 321).  She also stated that plaintiff complained of memory and hearing problems, as well as headaches.  (*Id.*). She reported that plaintiff had been hospitalized on January 31, 2014 for suicidal ideation, episodes of confusion, and memory problems,[8] and that he had received outpatient services in urgent care.  (*Id.*).  According to Dr. Siddiqi, plaintiff had been alert, calm, and cooperative at his most recent visit, though in the previous visit he was "dysphoric, tearful, [had] impaired cognition, [and was] frequently zoning out." (AR 322).  She noted that she had not formally tested his cognition.  (*Id.*).  She also reported plaintiff complained of issues with black outs and anxiety and stated that plaintiff's panicking emotionally paralyzed him and impaired, among other things, his ability to interact with his peers and perform daily activities.  (AR 322-23).  She did note that when stable he had good ADL.  (AR 323).  She diagnosed him with generalized anxiety disorder, a cognitive disorder, insomnia, and ADHD.  (AR 324).  She determined that, while his cognitive defects would likely not get better, his anxiety would improve.  (*Id.*).

On June 9, 2014, plaintiff saw Nagui Saleh, M.D., a doctor with Kaiser Permanente's Family Practice, following a motor vehicle accident.  (AR 405, 484).  Plaintiff denied losing consciousness, injuring his head, severe headaches or experiencing any symptoms of neurological impairment.  (AR 406, 485).  His neurological exam was normal.  (AR 406, 486).

Plaintiff underwent a lumbar spine fusion revision on August 13, 2014.  (AR 345). During his treatment for that surgery, he had intact cognition.  (AR 358-59).  Dr. Ergener discharged plaintiff on August 15, 2014, instructing him to return for a follow-up appointment in two weeks.  (AR 346).

---

[7] The description of plaintiff's panic episodes is illegible in the report.  (AR 321).
[8] Dr. Siddiqi also listed another complaint from the January 31, 2014 visit that is difficult to read, but the notes and complaints from plaintiff's January 31 visit are described in detail from the treatment notes from that visit.

On September 2, 2014, Dr. Ergener recorded that plaintiff's wife reported concerns about memory issues, and he recommended following up with neurology. (AR 401-02, 482-83). On September 11, 2014, during a visit with Dr. Bajwa, plaintiff reported having more memory problems and continuing issues with insomnia, but his anxiety was better. (AR 399, 477). He also stated that he remained independent in his activities of daily living and was driving without any limitations. (*Id.*). Upon examination, plaintiff's mental status appeared intact to all spheres, his language and speech were intact and while he seemed distracted at times, he was redirectable. (AR 400, 479). Plaintiff's EEG was normal, and his mental status examination was relatively intact, but Dr. Bajwa planned to repeat a brain MRI to evaluate for any changes. (AR 401, 480). Dr. Bajwa also raised the possibility of formal neuropsychological testing. (*Id.*). An October 12, 2014 MRI examination of plaintiff's head was stable without any change in size or appearance of the hyperintensity previously noted. (AR 427, 538-39, 882-83).

On February 5, 2015, plaintiff saw Hilary Newgen, M.D., a doctor with Kaiser Permanente's Neurology Department, for a second opinion regarding his cognitive impairments. (AR 466, 732). Plaintiff reported a history of possible concussions following two motor vehicle accidents, causing him to "blank[] out for awhile." (AR 466-67, 732-33). His wife indicated that she did not think he had had a full recovery. (AR 467, 733). His family also reported concerns such as personality changes, disruptions in his sleep, and socially inappropriate behaviors. (*Id.*). Plaintiff indicated that his cognitive issues affected his speech, and that he was unable to balance his checkbook or go grocery shopping by himself, but his blacking out episodes had resolved within the last year. (*Id.*). He was following up with psychiatry for his anxiety issues and reported a family history of early onset Alzheimer's dementia. (*Id.*). Plaintiff reported that the men in his family were diagnosed with dementia as early as 45 and rapidly

13

declined following their diagnosis. (*Id.*). His neurological functioning was intact, and his MOCA score was 27 out of 30. (AR 469, 736). Plaintiff indicated that he wanted to pursue neuropsychological testing and then consider a trial of Aricept or Namenda. (*Id.*). Dr. Newgen referred plaintiff to Laura Weinberg, Ph.D., a clinical neuropsychologist with the National Rehabilitation Hospital, for that testing. (AR 552).

On March 11, 2015, before going for neuropsychological testing, plaintiff visited Todd Rankin, M.D., a psychiatrist with Kaiser Permanente, because he was having difficulty sleeping due to anxiety caused by his memory problems. (AR 740-41). Plaintiff appeared "[a]lert, logical, calm, cooperative, [and] neatly dressed, [with] good eye contact, normal speech, . . . [and] adequate appearing cognition." (AR 741). Dr. Rankin did not formally test plaintiff's cognition. (*Id.*). The depression screening questionnaire revealed that plaintiff had mild depression. (AR 743). Dr. Rankin prescribed Seroquel to assist with anxiety and sleep induction. (AR 741-42).

On either April 15 or 16, 2015, Dr. Weinberg examined and tested plaintiff "to characterize current neurocognitive functioning and help identify any underlying organic cognitive impairment." (AR 552, 719, 892). Dr. Weinberg noted that plaintiff was alert and attentive, and although his speech was slightly dysarthric at times, it was "normal in volume, rate, prosody, and articulation" and no word finding difficulties or paraphasias were noted. (AR 556, 723, 896). Plaintiff stated that his mood was typical, and Dr. Weinberg found him to be cooperative, so she determined that the test results accurately represented plaintiff's neurocognitive functioning. (AR 556-57, 723, 896). Dr. Weinberg performed a broad range of tests including a Test of Memory Malingering, Test of Premorbid Functioning, Wechsler Adult Intelligence Scale – Fourth Edition, California Verbal Learning Test, Wechsler Memory Scale,

14

Trial Taking Test, Verbal Fluency Test, Boston Naming Test, Grooved Pegboard Test, Rey

Complex Figure Test, Wisconsin Card Sorting Test, Personality Assessment Inventory, Beck

Depression Inventory, and Beck Anxiety Inventory. (AR 558-61, 724-27).

     Dr. Weinberg reported that plaintiff had an estimated average premorbid level of

intelligence, and that he performed in the expected range of functioning overall. (AR 552, 719,

892). Plaintiff performed in the average range for verbal comprehension and perceptual

reasoning tasks, in the superior range for working memory tasks, and in the average range for

executive functioning. (*Id*.). He had a well-organized approach to visuospatial tasks and

"planned with an appreciation for the gestalt of the image," and he had a well-intact fluency

regarding semantic and phonemic tasks. (*Id*.). However, Dr. Weinberg reported that plaintiff's

verbal memory was variable, with average initial learning but a delayed recall of an auditory

story, and that he benefitted from a recognition format. (*Id*.). He was within the impaired range

on immediate and delayed list-learning tests, and had difficulty distinguishing list words from

distractors. (*Id*.). She noted that this suggested that plaintiff benefitted from verbal information

being presented in a structured format. (*Id*.). On the visual memory tests, plaintiff had low

average results on immediate visual tasks and average results on delayed visual tasks. (*Id*.). He

also showed variable performance on processing speed tasks, ranging from severely impaired to

low average, and often sacrificed speed to carefully complete the tasks. (AR 552, 719-20, 892-

93). He performed in the impaired range on motor speed tasks as well, sacrificing time for

accuracy, and he performed in the low average range on confrontation naming tasks. (AR 552,

720, 893). Dr. Weinberg also indicated that plaintiff's preoccupation with his physical

functioning may cause unhappiness and reduced efficiency in daily functioning. (AR 553).

Other than variable processing speed and verbal memory, and impaired motor speed, Dr. Weinberg determined that plaintiff had "intact skills across the remainder of cognitive domains." (*Id.*). She indicated that his difficulties with attention, concentration, misplacing common objects, indecisiveness, and restlessness could be explained by chronic ADHD persisting into adulthood. (*Id.*). She further stated that his anxiety or chronic pain could be contributing to any reported functional deficits and cognitive difficulties. (*Id.*). She did not rule out the potential impact of concussions on his cognitive symptoms, although she noted that she would have expected those symptoms to have resolved. (*Id.*). She did not find plaintiff to be presenting with early onset dementia, but she indicated that his neurocognitive abilities should be monitored. (*Id.*).

Dr. Weinberg recommended that plaintiff participate in weekly psychotherapy sessions to help manage his anxiety symptoms. (*Id.*). To the extent plaintiff decided to return to work, she stated that he may benefit from a different work setting as well as vocational rehabilitation if he needed support with that transition. (AR 553-54, 721, 894). She also recommended incorporating strategies to help plaintiff compensate for his reported difficulties, including breaking down assignments into smaller tasks, focusing his attention on one task at a time, reducing distractions, taking frequent breaks when working on detail-oriented tasks, adopting organization and planning strategies, and having information presented in a structured format such as sending him structured emails or discuss important or complicated tasks in person. (AR 554, 721, 894).

Plaintiff visited Stephanie Prakash, a licensed clinical social worker with Kaiser Permanente's Psychotherapy Department, on September 21, 2015, complaining of memory issues and significant lapses in time. (AR 627, 803). He reported that his time lapses lasted

16

several hours, his speech was slurred, he would forget his children's names, he was confused and sometimes got lost, and he occasionally had "fuzzy vision" that cleared when he rubbed his eyes. (AR 628, 804). He stated that he was unable to perform his responsibilities at his job at the end of 2012 after successfully working there for twelve years, and that he was moved to less stressful positions that he eventually resigned from because he could not perform those roles either. (*Id.*). He also stated that he had been arrested on suspicion of being drunk in public a few months earlier due to his slurred speech, but he was released with an apology. (AR 628-29, 804-05). He had been let go after one day at a new job because his employer thought his slurred speech suggested he was "on something," and he had not made it past other interviews due to that slurred speech. (AR 628, 804). He had normal speech at this visit, and his concentration was within normal limits. (AR 629, 805). Plaintiff was diagnosed with a cognitive disorder and alcohol dependence in full sustained remission, and it was recommended that he begin individual psychotherapy, maintain a personal routine, increase self-care activities, engage in bibliotherapy, take medications as prescribed, and keep scheduled follow-up appointments. (AR 630, 806). Plaintiff's depression screening indicated a mild level of depression. (AR 631, 807).

At a visit with Darlene Jones, D.O., a doctor with Kaiser Permanente's Anesthesia Department, for his low back pain on September 24, 2015, plaintiff appeared alert and oriented, he denied having depression or anxiety, and stated that he was sleeping 7-8 hours at night. (AR 647, 822).

After a seventeen month gap, plaintiff saw Noman Shamim, M.D., a psychiatrist with Kaiser Permanente, on February 24, 2017, complaining of memory and sleep problems and anxiety. (AR 679, 854). Dr. Shamim stated that plaintiff's anxiety was generally related to his memory problems, and that his memory problems are believed to be possibly due to previous

17

alcohol and substance abuse as well as multiple concussions and possible early-onset dementia."
(*Id.*). Dr. Shamim reported that plaintiff was alert, logical, and calm, and that he had normal
speech and adequate cognition, though his cognition was not formally tested that day  (AR 680,
855).  They discussed techniques to improve plaintiff's memory without medication, and
plaintiff agreed to try Seoquel and Lexapro. (AR 679-80, 854-55).  Plaintiff's depression
screening indicated moderately severe depression. (AR 682, 857).

On March 27, 2017, plaintiff saw Dr. Starkie for another opinion on his memory
problems. (AR 688, 863).  Plaintiff reported that his symptoms had progressed over the past
year when he did not have Kaiser, and that he shook all the time, got confused, and slurred his
speech.  (*Id.*).  Plaintiff stated that an outside neurologist told plaintiff that his problems were
"nerve damage."  (*Id.*).  Plaintiff reported that he could plan, but that he forgot everything; he
could not handle finances; he misplaced objects in the house and forgot why he would go into a
room; he had difficulty remembering the names of close family and friends; and he suffered from
hallucinations.  (*Id.*).  Dr. Starkie observed that plaintiff could recall his medical history well, but
that he was at times agitated and tearful. (AR 689, 864).  His MOCA Score was 18 out of 30,
which was consistent with moderate dementia but "not [consistent with] his presentation
otherwise."  (*Id.*).  He instructed plaintiff to get several scans and tests, though he expected the
tests to "show that [the] problems had a strong behavioral component."  (*Id.*).  Dr. Starkie also
noted that cannabis use "may not be a good choice in the setting of memory problems, but he
[plaintiff] feels it is the only thing which controls his pain."  (*Id.*).

On March 29, 2017, plaintiff met with Wyndy L. Marthinussen, a licensed clinical social
worker with Kaiser Permanente, complaining of frustrations with getting the correct medical
attention and diagnosis. (AR 872).  Among plaintiff's complaints, he stated that he had a

depressed mood, decreased concentration, and anxiety. (*Id.*). Ms. Marthinussen observed that plaintiff was alert and oriented with fluent speech and good judgment, but that he had a depressed mood. (*Id.*). His recent and remote memory was adequate. (*Id.*). Ms. Marthinussen diagnosed him with a depressive disorder with moderate recurrent episodes of anxiety and stress as well as chronic pain. (AR 873). They discussed individual therapy, balancing plaintiff's daily schedule, his activities of daily living, exercise, nutrition, sleep, stress reduction techniques, self-care, and utilizing his support network. (*Id.*). Ms. Mathinussen provided him with some goals to complete before his next therapy session. (*Id.*). Plaintiff's depression screening questionnaire indicated a moderate level of depression. (AR 874).

On March 19, 2018, Timothy Fratto, Ph.D., a clinical neuropsychologist with Neuropsychology Associates of Fairfax, LLC, performed a neuropsychological evaluation of plaintiff. (AR 8).[9] Plaintiff reported that he had seen psychiatrists for four years and therapists for two to three years to help with his depression and stress, and that he had experienced worsening cognitive difficulties since his last neuropsychological evaluation. (AR 8). He stated that his mood was even and seemed better on his current medication regimen, and that his fogginess had improved. (AR 9). He also stated that he had reduced his socialization because he was embarrassed by cognitive and expressive language errors. (*Id.*). The day of the evaluation, plaintiff was alert and oriented, and he did not "experience undue anxiety during testing." (*Id.*). He had logical, linear, and goal-directed thought processes, and he did not have issues of inattentiveness, hyperactivity, or impulsivity, but he relied on his wife for details of his history. (*Id.*). Dr. Fratto did not record any issues with conversational speech or receptive language, and his energy level was typical. (AR 9-10). He "performed well on many cognitive tests," but

---

[9] While these records post-date the ALJ's final decision in this case and were not considered by the Appeals Council, for the sake of completeness they will be summarized in this report and recommendation.

some results were atypical, and Dr. Fratto noted that those inconsistencies could indicate cognitive difficulties. (AR 10). He stated that the results should be interpreted "with caution as they may underrepresent Mr. McNiff's true cognitive abilities in some areas." (*Id.*).

As for specific results, although one premorbid intellectual ability test result fell below expectations, overall Dr. Fratto determined that performance showed that plaintiff had average premorbid intellectual ability. (*Id.*). Plaintiff had a strong working memory and average perceptual reasoning, but he fell below expected levels on verbal comprehension and processing speed. (*Id.*). He had an intact simple attention span, but his performance on sustained attention tests fell below expectations. (AR 11). He had intact rapid mental processing/resistance to interference and working memory, but he had inconsistent scores on reasoning, mental flexibility, and problem-solving tests. (*Id.*). There was no evidence of perceptual distortion, and he had intact receptive language, but his expressive language fell below expectations. (AR 12). He had intact narrative learning and retention of learned verbal information, but his list and figure learning and recall scores fell below expectations. (*Id.*). His recognition memory also fell below expectations, even with cuing. (*Id.*). He also performed below expectations on psychomotor speed. (AR 13). Plaintiff experienced an unusual degree of concern about his physical functioning and health, and "endorsed items suggestive of peculiarities in thinking and experiences," including distractibility and difficulty concentrating. (*Id.*). He reported significant affective symptoms of anxiety, and Dr. Fratto concluded that "psychiatric factors . . . play[] a role in the current clinical picture." (*Id.*).

Dr. Fratto found that given the "equivocal nature" of the test results, variability of plaintiff's performance, and lack of pattern in the findings, he could not "determine the etiology of Mr. McNiff's neurocognitive presentation." (*Id.*). In particular, he noted that common

20

symptoms of a mild traumatic brain injury, from which plaintiff may have suffered after his car accidents, would be expected to resolve in a few weeks after the injury, and symptoms of post-concussion syndrome should generally improve over time. (AR 13-14). He also stated that plaintiff's history of psychiatric distress could negatively impact cognitive functioning and interfere with cognitive testing. (AR 14). He noted that individuals like plaintiff would likely experience increased cognitive difficulties at times of increased physical discomfort or times of heightened emotionality or stress, and that chronic pain could interfere with his cognitive testing. (*Id.*). He observed that plaintiff has reported sleep disturbance and took numerous medications that cause sedation as well as medical marijuana, which could all interfere with cognitive efficiency and testing. (*Id.*).

Dr. Fratto recommended that plaintiff continue to follow-up with his neurologist to monitor his cognitive functioning, and with his psychiatrist and psychotherapist to help with his psychiatric distress. (AR 14-15). He also recommended cognitive rehabilitation, physical therapy, and vestibular therapy to see if any of those programs could help improve or reduce his symptoms, as well as possible medication management and chronic pain management. (*Id.*). Because sleep disturbance may be a factor, Dr. Fratto suggested plaintiff participate in a sleep study to help diagnose and treat a possible sleep disorder. (AR 15). He stated that plaintiff should revisit his medical marijuana use and medication regimen, which might have side effects that impact his cognition, but noted that the benefits of those treatments may outweigh the side effects. (*Id.*). He also stated that the structured nature of the evaluation likely maximized plaintiff's level of performance, and that he may benefit from certain "behavioral accommodations," including using of time management strategies, breaking larger tasks into smaller pieces, avoiding multi-tasking, taking breaks as needed to avoid attentional drift,

maintaining an organized work environment, working in a place "relatively free from distractions," using an organizational system to track appointments and tasks, allowing himself extra time to complete "cognitively demanding tasks," reviewing information he wants to learn several times, using a pillbox and dosage alarm to help with medication compliance, and increasing his socialization. (AR 15-16).

### D.    The ALJ's Decision on November 27, 2017

Determining whether an individual is eligible for DIB requires the ALJ to employ a five-step sequential evaluation. It is this process the court must examine to determine whether the correct legal standards were applied and whether the ALJ's final decision is supported by substantial evidence. *See* 20 C.F.R. § 404.1520. Specifically, the ALJ must consider whether a plaintiff: (1) is currently engaged in substantial gainful employment; (2) has a severe impairment; (3) has an impairment that meets or equals any of the impairments listed in Appendix 1, Subpart P of the regulations that are considered *per se* disabling; (4) has the ability to perform his past relevant work; and (5) if unable to return to past relevant work, whether plaintiff can perform other work that exists in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. When considering a claim for DIB, the ALJ must also determine whether the insured status requirements of sections 261(i) and 223 of the Social Security Act are met. *See* 42 U.S.C. §§ 416(i), 423. The regulations promulgated by the Social Security Administration provide that all relevant evidence will be considered in determining whether a plaintiff has a disability. *See* 20 C.F.R. § 404.1520(a)(3).

Here, the ALJ made the following findings of fact: (1) plaintiff meets the insured status requirements of the Social Security Act through December 31, 2017; (2) plaintiff has not engaged in substantial gainful activity since August 19, 2013, the alleged onset date; (3) plaintiff has the following severe impairments: degenerative disc disease of the lumbar spine post L4-S1

fusion, mild obesity, depressive disorder, attention deficit hyperactivity disorder (ADHD), and marijuana abuse; (4) plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1; (5) plaintiff has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b), except that plaintiff can stand and/or walk four hours out of an eight hour workday, occasionally climb ramps or stairs, balance, stoop, kneel, crouching, and crawl, can never climb ladders, ropes, or scaffolds, and can carry out simple to moderately complex tasks in two-hour increments with ten- or fifteen-minute breaks in between.  (AR 26-32).  At step four of the sequential process, (6) the ALJ made no finding about whether the plaintiff can do past relevant work because of the "expedited process" pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).  (AR 32-33).  The ALJ then proceeded to step five of the sequential evaluation process: (7) plaintiff was born in 1973 and was 40 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date; (8) plaintiff has at least a high school education and is able to communicate in English; (9) transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the plaintiff is "not disabled," whether or not the plaintiff has transferable job skills; and (10) considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.  (AR 33-34).  Finally, the ALJ concluded: (11) plaintiff has not been under a disability, as defined in the Social Security Act, from August 19, 2013, through the date of the ALJ's decision.  (AR 34).

## III.   ANALYSIS

### A.   Overview

Plaintiff's motion for summary judgment argues that the ALJ committed three errors. First, plaintiff contends that the ALJ failed to properly evaluate and weigh the opinions of Dr. Weinberg. (Docket no. 12 at 4-8). Second, plaintiff contends that the ALJ failed to properly account for plaintiff's moderate impairment in concentration, persistence, and pace. (*Id.* at 8–10). Third, plaintiff argues that the ALJ failed to provide good reasons for according less than controlling weight to Dr. Siddiqi's treating source opinions. (*Id.* at 10–13).

### B.   The ALJ's failure to assign a specific weight to Dr. Weinberg's opinions is harmless error.

#### 1.   *The ALJ erred by failing to assign a specific weight to Dr. Weinberg's opinions.*

Plaintiff first argues that the ALJ erred by failing to assign any specific weight to Dr. Weinberg's opinions. (Docket no. 12 at 4). He also contends that Dr. Weinberg's findings are more restrictive than what is included in the residual functional capacity. (*Id.* at 4-5). Plaintiff acknowledges that the ALJ discussed Dr. Weinberg's findings, but he alleges that the ALJ failed to properly evaluate and consider Dr. Weinberg's opinions in accordance with 20 C.F.R. § 404.1527. (*Id.* at 6). The Commissioner responds that "[a]lthough the ALJ did not specifically quantify the weight given to Dr. Weinberg's report, the ALJ drew reasonable inferences from the report that the Court should not disturb under the substantial evidence standard." (Docket no. 14 at 14). Further, the Commissioner argues that "Dr. Weinberg did not place any specific limitations upon plaintiff," and although she made suggestions to help plaintiff with his subjective complaints, the ALJ was not required to weigh Dr. Weinberg's report. (*Id.* at 14-15).

During the sequential analysis, the ALJ must analyze the claimant's medical records provided and any medical evidence from consultative or medical expert evaluations when

24

determining whether the claimant has a medically-determinable severe impairment, or combination of impairments, which would significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1512, 404.1527, 416.912, 416.927. The ALJ must consider all medical opinions and, if the medical opinions are internally inconsistent or inconsistent with each other or other evidence, evaluate the opinions and assign them weights as part of the analysis. § 404.1527(c)(2)-(6), (d); *see also* § 404.1527(c)(1) ("Generally, [the Commissioner] give[s] more weight to the medical opinion of a source who has examined [plaintiff] than to the medical opinion of a medical source who has not examined [plaintiff].");  *see also Tanner v. Comm'r of Soc. Sec.*, 602 Fed. App'x 95, 100 (4th Cir. 2015) ("An ALJ is required to assign weight to every medical opinion in a claimant's record.") (citing 20 C.F.R. § 404.1527(c))). A reviewing court "cannot determine if findings are unsupported by substantial evidence unless the [ALJ] explicitly indicates the weight given to all the relevant evidence." *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (citing *Myers v. Califano*, 611 F.2d 980, 983 (4th Cir. 1980); *Strawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979); *Arnold v. Sec'y of Health Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977)). If the ALJ fails to "sufficiently explain[] the weight [s]he has given to obviously probative exhibits, to say that h[er] decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold*, 567 F.2d at 259 (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

The regulations provide that the ALJ "will always consider medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. § 404.1527(c). "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and

prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." *Id.* § 404.1527(a)(1). Dr. Weinberg examined plaintiff "to characterize current neurocognitive functioning and help identify any underlying cognitive impairment;" she considered his current complaints and medical, family, and social history; observed his behaviors; and performed testing to assess his neurocognitive functioning. (AR 552-61). She then provided recommendations based on her examination. (AR 553-54). Accordingly, it appears that Dr. Weinberg's report satisfies the definition of "medical opinion" under § 404.1527(a)(1). While the ALJ did discuss Dr. Weinberg's testing and opinions and the impact her opinions, testing, and recommendations had on the residual functional capacity, the ALJ did not specifically state the weight she was giving Dr. Weinberg's opinions. (AR 31-32). As shown in the ALJ's decision, she did specifically address the weight being given to the state agency psychological consultants (partial weight) and weight given to plaintiff's psychiatrist (little weight) and the reasons for those limitations. (AR 32). Therefore, it is recommended that the court find that the ALJ erred in failing to assign a specific weight to Dr. Weinberg's opinions.

2.    *The failure to assign a specific weight to Dr. Weinberg's opinions amounts to harmless error.*

An ALJ's failure to assign a specific weight to a medical opinion must cause plaintiff harm in order to merit remand or reversal. *See Tanner*, 602 Fed. App'x at 100-01 (holding that failure to assign weight to a treating physician's opinion did not warrant reversal when "the RFC assessment and [the treating physician's opinion were] largely consistent, and it [was] highly unlikely, given the medical evidence of record, that a remand to the agency would change the Commissioner's finding of non-disability"); *Keaton v. Colvin*, No. 3:15cv588, 2017 WL 875477, at *4-5 (E.D. Va. Mar. 3, 2017) (holding that plaintiff failed to meet her burden of showing that the ALJ's failure to assign a specific weight to medical opinions was harmful). When the ALJ

26

considers the medical opinion, discusses that opinion, and incorporates that opinion into the residual functional capacity in a way that is consistent with the evidence in the record, the failure to assign a specific weight can amount to harmless error. *See Tanner*, 602 Fed. App'x at 100-01; *Keaton*, 2017 WL 857477, at *4-5. *But see Arnold* 567 F.2d at 259-60 (holding that the ALJ's mere recital that he considered the evidence without discussing that the medical opinion had been weighed or assigning it a weight required remand).

Plaintiff argues that the ALJ's failure to assign a specific weight is "problematic" because the mental residual functional capacity contained in the ALJ's decision is not consistent with Dr. Weinberg's opinions, leaving the parties and the court "to guess as to how the ALJ arrived at her conclusion." (Docket no. 12 at 6). In making this argument, plaintiff analogizes the term "moderately complex tasks" in the residual functional capacity to "semi-skilled work," which the Social Security Administration defines "as work that involves some skills but does not require doing more complex work duties."[10] (*Id.* at 7 (citing 20 C.F.R. § 404.1568(b)). Plaintiff argues that Dr. Weinberg's suggestion that plaintiff break assignments down "into smaller more manageable tasks" is not consistent with an ability to perform moderately complex tasks, an inconsistency the ALJ did not explain. (*Id.*). The Commissioner argues that, if the ALJ was required to weigh Dr. Weinberg's report, the failure to do so is harmless because the ALJ considered that report, formulated a residual functional capacity consistent with the report, and

---

[10] The Social Security Administration defines "semi-skilled work" in full as

work which needs some skills but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks.

20 C.F.R. § 404.1568(b).

found jobs plaintiff was able to perform.  (Docket no. 14 at 15).  The Commissioner also argues that Dr. Weinberg did not preclude plaintiff from performing "simple to moderately complex tasks," and that the ALJ's decision relies on three unskilled jobs that would not require work on detailed or moderately complex tasks at all.  (*Id.* at 16-17).

A review of the ALJ's decision reveals that the court is not left to guess how the ALJ arrived at her conclusion, nor are Dr. Weinberg's opinions inconsistent with the residual functional capacity as applied by the ALJ.  The ALJ's failure to assign Dr. Weinberg's opinions a specific weight is harmless error.  The ALJ described plaintiff's medical history regarding his neurological and cognitive complaints, including a thorough summary of Dr. Weinberg's report. (AR 30-31).  The ALJ recognized that plaintiff had some difficulty with process speed, motor speed, and verbal memory, but noted Dr. Weinberg's finding that plaintiff had intact skills across the remainder of cognitive domains.  (AR 31).  The ALJ also indicated that Dr. Weinberg's objective findings contradicted some of plaintiff's reported complaints.  (*Id.*).  After considering Dr. Weinberg's evaluation along with the rest of plaintiff's medical history, the ALJ determined that "the objective findings are overall not entirely consistent with the claimant's allegations," but she still included some mental limitations into the residual functional capacity to account for those reported difficulties.  (*Id.*).  After reviewing the objective evidence, including Dr. Weinberg's report, the ALJ clearly afforded greater weight to the medical opinions that showed more normal cognitive evaluations than to the opinion that plaintiff's anxiety was debilitating.

Although Dr. Weinberg's opinion does note some performance issues, she found plaintiff to be in the "expected range of functioning" overall (AR 552), which is again consistent with the conclusion that the objective findings do not entirely support plaintiff's reported symptoms (AR 32).  The ALJ focused her discussion on Dr. Weinberg's suggestions (AR 32), which do not

expressly limit the work plaintiff can do but provide recommendations in the event he encounters difficulties with his reported symptoms (AR 553-54). Importantly, these suggestions provided strategies to help plaintiff complete detail-oriented tasks in line with the requirements of semi-skilled work; Dr. Weinberg did not opine that plaintiff was unable to complete such tasks. (*Id.*). The ALJ explained that Dr. Weinberg's recommendations "generally show an ability to perform simple to moderately complex tasks with breaks as detailed in the above residual functional capacity" (AR 32), indicating that those recommendations informed her formulation of the residual functional capacity. Indeed, plaintiff admits that the ALJ "did seem to favor Dr. Weinberg's opinions" (Docket no. 12 at 8), and the record supports that assumption.

Further, even if the court could not determine how the ALJ treated Dr. Weinberg's opinions or determined that her opinions were inconsistent with the residual functional capacity, remand is not warranted in this case. The Social Security Administration does not deem a person disabled if he can do work that exists in the national economy, even if that person remains unemployed. 20 C.F.R. § 404.1566(b)-(c). Plaintiff's argument focuses on certain recommendations in Dr. Weinberg's report and the ability to do semi-skilled work. (Docket no. 14 at 4-8). However, the ALJ identified three sedentary, unskilled occupations that plaintiff could perform based on the vocational expert's testimony, which the vocational expert provided in response to a more restrictive residual functional capacity. (AR 28, 33-34, 74-75). Nowhere does plaintiff argue that Dr. Weinberg's opinions indicated that he would be unable to do unskilled work.[11] Accordingly, plaintiff has not shown that a more restrictive residual functional

---

[11] In his second argument, plaintiff contends that the ALJ erred by failing to reasonably account for plaintiff's moderate limitations in concentration, persistence, and pace by limiting him to simple, routine, or unskilled work. (Docket no. 12 at 8-10). As explained below, the undersigned recommends a finding that the ALJ properly accommodated those limitations and adequately explained her reasoning, so that argument does not impact this harmless error analysis.

capacity limiting plaintiff to unskilled work would impact the ALJ's determination that the plaintiff could perform certain jobs that exist in the national economy.

Plaintiff also argues that Dr. Weinberg examined plaintiff "at the request of the Social Security Administration" and later describes Dr. Weinberg as "an expert on disability evaluation." (Docket no. 12 at 5, 7). Plaintiff then argues that based on this expertise, Dr. Weinberg used the term "frequent" to mean "from one-third to two-thirds of the time," as defined by the Social Security Administration, indicating that she had expressly opined that plaintiff would need to be off-task more than 20% of the workday. (*Id.* at 7). The Commissioner argues that the three unskilled jobs the ALJ identified in the decision do not require plaintiff to work on moderately or detailed tasks, so the argument that plaintiff might be "off task" for more than 20% of the day when performing detailed-oriented work does not apply. (Docket no. 14 at 17). However, the record does not support plaintiff's characterization of the facts, regardless of the merits of the Commissioner's response.

First, plaintiff cites to Dr. Weinberg's report when stating that plaintiff was evaluated at the Social Security Administration's request. (Docket no. 12 at 5; AR 552). That report states that plaintiff "was referred for a neuropsychological evaluation by Dr. Newgen to characterize current neurocognitive functioning and help identify any underlying organic cognitive impairment." (AR 552). Dr. Newgen is a neurologist with Kaiser Permanente who provided a second opinion regarding plaintiff's cognitive impairment following his visit with Dr. Bajwa at the Springfield Neurology Outpatient clinic. (AR 410, 466). Plaintiff was referred to Dr. Bajwa by Dr. Kin during an emergency room visit. (AR 414). Nowhere does the record show that the Social Security Administration requested that Dr. Weinberg examine plaintiff.[12]

---

[12] This is reinforced by the case development sheet notes showing that the Social Security Administration had to contact plaintiff's representative to obtain the report prepared by Dr. Weinberg. (AR 255).

Second, though neither party disputes Dr. Weinberg's credentials or suggests that she is not an expert in her field of neuropsychology, nor does the undersigned make such a recommendation, plaintiff's argument that Dr. Weinberg is an "expert on disability evaluation" is unfounded. (Docket 12 at 7). Again, the record does not demonstrate that the Social Security Administration requested Dr. Weinberg to examine plaintiff, and neither of the state agency disability determination reports required a consultative examination. (AR 83, 96). The ALJ also evaluated the state agency psychologists' findings together, separate from her evaluation of Dr. Weinberg's findings. (AR 32). The record does not show that Dr. Weinberg has a particular expertise in disability evaluations, and plaintiff has not explained how he reached the conclusion that Dr. Weinberg examined plaintiff at the request of the Social Security Administration or that she was an expert on disability evaluation. Thus, the argument that Dr. Weinberg would have used the term "frequent breaks" as defined by Social Security regulations finds no support in the record, and the undersigned does not accept that characterization of Dr. Weinberg's specialized knowledge.

Based on the foregoing, the undersigned recommends a finding that the ALJ's failure to assign a specific weight to Dr. Weinberg's opinion amounts to harmless error.

### C.     The ALJ properly accounted for plaintiff's moderate impairment in concentration, persistence, and pace.

Plaintiff's second challenge to the ALJ's decision is that the ALJ did not properly account for plaintiff's moderate impairment in concentration, persistence, and pace. (Docket no. 12 at 8). Plaintiff argues that the ALJ's allowance for breaks every two hours in the residual functional capacity does not properly accommodate this limitation. (*Id.*). Plaintiff compares the ALJ's decision here to the decision in *Mascio v. Colvin*, 780 F.3d 632, and argues that the Fourth Circuit has ruled that limiting a claimant to simple, routine, or unskilled work does not

31

accommodate a moderate limitation in concentration, persistence, or pace. (Docket no. 12 at 9). Plaintiff also contends that this case is analogous to *Mascio* because the ALJ did not explain how that limitation is accommodated for or why it was not included in the residual functional capacity. (*Id.* at 10).

The Commissioner argues that "*Mascio* stands for the proposition that an ALJ may not exclude all mental limitations from a residual functional capacity, despite finding moderate limitations in concentration, persistence, or pace, without an adequate basis for doing so set forth in the decision and medical record." (Docket no. 14 at 18). The Commissioner then distinguishes the decision at issue here from that in *Mascio* because the ALJ here found, at most, a moderate limitation based on plaintiff's subjective complaints and "gave Plaintiff the benefit of the doubt and assessed moderate limitations for step three purposes." (*Id.*). The Commissioner argues that the ALJ expanded on that conclusion, pointing to Dr. Weinberg's findings of superior working memory and executive functioning performance and other mental health evaluations that showed no objective findings of memory deficits. (*Id.*). Then, the ALJ explained that she accommodated plaintiff's limitation in concentration, persistence, and pace because plaintiff "'generally show[ed] an ability to perform simple to moderately complex tasks;' in 2-hour increments with 10- or 15-minute breaks in between," providing, the Commissioner argues, the explanation that *Mascio* lacked. (*Id.* at 18-19) (alteration in original). The Commissioner also notes that the ALJ asked the vocational expert for jobs that would account "for a more restrictive subset of limitations" in that the hypothetical involved only "simple tasks." (*Id.* at 19).

Plaintiff responds to the Commissioner's arguments stating that the ALJ's residual functional capacity did not limit plaintiff to simple, routine, and unskilled work, but instead provided for even less restrictive limitations than the ALJ provided for in *Mascio*. (Docket no.

18 at 3).  Therefore, plaintiff argues that the limitations the ALJ included in the residual
functional capacity are insufficient.  (*Id.*).

In *Mascio*, the ALJ posed hypotheticals to the vocational expert that "said nothing about
Mascio's mental limitations;" the vocational expert responded with examples of available
unskilled, light work jobs on his own.  780 F.3d at 637-38.  On appeal, the Commissioner
acknowledged that the ALJ had not included a limitation for concentration, persistence, or pace,
providing two reasons the ALJ did so.  *Id.* at 638.  The Fourth Circuit rejected those
explanations, determining that the record did not support those rationalizations and finding that
the ALJ needed to provide a better explanation.  *Id.*  While the *Mascio* court found that only a
limitation regarding the ability to stay on task would account for a claimant's limitation in
concentration, persistence, or pace, it did not find that the ALJ erred simply because the ALJ
excluded that limitation from Mascio's residual functional capacity.  *Id.*  Instead, the Fourth
Circuit noted that the ALJ might "find that the concentration, persistence, or pace limitation does
not affect Mascio's ability to work, in which case it would have been appropriate to exclude it
from the hypothetical tendered to the vocational expert.  But because the ALJ here gave no
explanation, a remand is in order." *Id.* (citation omitted).

Therefore, the Fourth Circuit requires ALJs to explain the connection between the
medical evidence considered and the accommodation, or lack thereof, for moderate limitations in
concentration, persistence, and pace in the residual functional capacity.  *See id.*  This court has
previously held that providing for specific limitations beyond simply restricting plaintiff to
unskilled work in both the hypotheticals to the vocational expert and in the residual functional
capacity may account for such moderate limitations.  *See, e.g., Jolly v. Berryhill*, No. 4:16cv38,
2017 WL 3262186, at *7-9 (E.D. Va. July 13, 2017), *report & recommendation adopted*, 2017

33

WL 3262256 (July 31, 2017) ("[U]nlike the plaintiff in *Mascio*, Jolly's RFC included specific,

detailed limitations to accommodate his mental impairments."); *Dworak v. Colvin*, No.

3:15cv446 (JAG), 2016 WL 4111380, at *3-5 (E.D. Va. June 3, 2016), *report &*

*recommendation adopted*, 2016 WL 4107698 (E.D. Va. July 29, 2016) ("Unlike *Mascio*, the ALJ

here did more than restricting Plaintiff to simple, routine tasks or unskilled work. The ALJ

accounted for Plaintiff's ability to 'stay on task' by limiting her to occasional exposure with

supervisors, co-workers and the public."); *Fowler v. Colvin*, No. 3:14cv855 (HEH), 2015 WL

8488971, at *6-7 (E.D. Va. Oct. 13, 2015), *report & recommendation adopted*,  2015 WL

8484443 (E.D. Va. Dec. 9, 2015) ("[T]he ALJ properly included Plaintiff's psychological

deficiencies in the hypothetical posed to the VE, despite Plaintiff's argument to the contrary.

Specifically, the ALJ's hypothetical described a worker who could not work more than two

hours at a time without a break." (citations omitted)); *see also Sizemore v. Berryhill*, 878 F.3d

72, 80-81 (4th Cir. 2017) ("The opinions of . . . two doctors thus provided substantial support for

the ALJ's finding that, despite Sizemore's overall moderate difficulties with concentration,

persistence, or pace, he would nonetheless be able to *stay on task* while performing 'simple one,

two-step tasks,' as long as he was 'working in low stress non-production jobs with no public

contact.'").

In her decision, the ALJ analyzed each of plaintiff's physical and mental impairments,

assigning and explaining the limitation plaintiff had for each impairment. (AR 26-28). As

relevant here, the ALJ determined that plaintiff had "no more than moderate limitation" in

"concentrating, persisting, or maintaining pace," acknowledging that plaintiff reported difficulty

with concentration and stating that he could only pay attention for fifteen minutes at a time but

noting that the medical records indicated normal attention and concentration, that he attended

well to his examiners, and that he was redirectable when distracted. (AR 27). The ALJ then determined that plaintiff had a residual functional capacity to perform light work with certain limitations, including the ability to "carry[] out simple to moderately complex tasks in 2-hour increments with 10- or 15-minute breaks in-between." (AR 28, 73-75).

The ALJ explained that she followed the required two-step process to consider plaintiff's symptoms. (AR 28). At the first step, she determined "whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms." (AR 28). The ALJ discussed plaintiff's physical, psychological, and cognitive complaints, finding "that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms." (AR 28-29). At the second step, she evaluated "the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit claimant's functional limitations." (AR 28). The ALJ found that plaintiff's statements regarding "the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (AR 29). The ALJ proceeded to describe plaintiff's relevant medical history in detail, first discussing his physical symptoms and then turning to his cognitive and psychological complaints. (AR 29-30). She described plaintiff's record of largely normal neurological examinations despite his subjective complaints. (AR 30-31). This included a consideration of plaintiff's normal EEG, stable MRI, improvement with medication, past neurological evaluation, and history of normal cognition and thought processes. (*Id.*).

The ALJ then analyzed the opinions of the state agency medical consultants and plaintiff's treating sources, explaining the consistencies and inconsistencies of the opinions with the record as a whole and the residual functional capacity. (AR 31-32). Specifically, she gave

the opinions of the state agency psychologists partial weight "to the extent they support no more than mild or moderate functional limitations." (AR 32). She explained that Dr. Siddiqi's opinion that plaintiff cannot perform activities of daily living, interact with his peers, or get out of bed during panic episodes; that he has limited recall and poor cognition; and that he zones out, was inconsistent with his normal mental status examinations, improvement with medication, Beck Depression and Anxiety Inventory scores, and "general lack of significant anxiety complaints." (*Id.*). She afforded Dr. Siddiqi's opinion little weight, finding that the record did not support a finding of debilitating anxiety. (*Id.*). She also evaluated Dr. Weinberg's recommendations that plaintiff break down tasks and take frequent breaks, among other strategies, to compensate for his subjective complaints, concluding they "generally show an ability to perform simple to moderately complex tasks with breaks, as detailed in the . . . residual functional capacity." (*Id.*).

The ALJ did not find that the objective medical evidence fully supported plaintiff's reported cognitive and neurological symptoms but she still included mental limitations in the residual functional capacity to accommodate for those complaints and certain cognitive impairments noted in the record. (AR 31). The ALJ specifically identified that plaintiff was redirectable when distracted (AR 27), and Dr. Weinberg's opinion did not preclude plaintiff's ability to perform detail-oriented tasks. (AR 32). In fact, the ALJ's decision states that plaintiff could benefit from "reducing distractions and *taking frequent breaks*" when working on such tasks. (AR 32) (emphasis added). Accordingly, the ALJ not only limited the level of tasks plaintiff could perform, but also limited those tasks to a two-hour time period with ten- to fifteen-minute breaks, explaining in her analysis that Dr. Weinberg's recommendations led her to that limitation. (AR 28, 32). Therefore, although the ALJ did not use the terms "concentration, persistence, and pace," she expressly linked Dr. Weinberg's recommendations to the limitations

36

included in the residual functional capacity, providing an adequate explanation for the accommodation in concentration, persistence, and pace that is supported by substantial evidence.

For these same reasons, the undersigned is also not convinced by plaintiff's argument that the ALJ's less restrictive limitations in the plaintiff's residual functional capacity, allowing for up to moderately complex tasks, is insufficient to accommodate plaintiff's limitation in concentration, persistence, or pace when compared to the more-restrictive limitations the ALJ imposed in *Mascio*. The ALJ's erred in *Mascio* by failing either to reasonably accommodate Mascio's mental limitations or to provide an adequate explanation for that limitation. *See Mascio*, 780 F.3d at 637-38. As explained above, Dr. Weinberg made recommendations to help plaintiff with completing detail-oriented tasks (AR 553-54); she did not state that plaintiff could not perform any level of detail-oriented tasks during the relevant time period. Further, the ALJ here, unlike the ALJ in *Mascio*, not only considered plaintiff's mental symptoms and limitations, but she also included those limitations in her questions to the vocational expert and in the residual functional capacity and articulated how she accounted for those limitations. (AR 26-32). The limitations in the instant action, though arguably less restrictive in the level of work provided for in *Mascio*, are adequately explained and supported by the record. Thus, the ALJ's analysis of plaintiff's history of normal neurological evaluations, the medical opinions, and Dr. Weinberg's recommendations, coupled with her explanation that Dr. Weinberg's findings "generally show an ability to perform simple to moderately complex tasks with breaks" (AR 32) directly after her discussion of those findings, establishes that the ALJ's residual functional capacity is supported by substantial evidence and accounts for up to a moderate impairment in concentration, persistence, and pace.

It is important to note that the limitations concerning plaintiff's concentration, persistence, and pace actually relied upon by ALJ in finding the plaintiff capable of performing jobs that exist in significant numbers in the national economy were more restrictive than those limitations stated in the residual functional capacity. (AR 33-34, 73-75). The ALJ's decision cites three sedentary, unskilled occupations (quality control worker, grading/sorting worker, finish machine operator). (AR 34). As shown in the transcript of the hearing held on May 8, 2017, not only did the hypothetical to the vocational expert include the ability to perform "simple tasks in two hour increments with ten to 15 minute breaks in between," but also limitations the plaintiff should have only occasional interaction with coworkers and supervisors, no interaction with the general public, and only simple changes in a routine work setting. (AR 73-75). Plaintiff fails to address the fact that the limitations upon which the ALJ relied in making her "not disabled" decision were considerably more restrictive than the residual functional capacity stated in paragraph 5 of the decision.

The ALJ's decision in this case does provide specific limitations addressing issues relating to concentration, persistence, and pace and adequately explains the basis for those limitations. Accordingly, the undersigned recommends a finding that the ALJ properly accounted for plaintiff's moderate impairment in concentration, persistence, and pace.

**D.**    **The ALJ provided good reasons for according less than controlling weight to Dr. Siddiqi's treating source opinion.**

Plaintiff's third challenge to the ALJ's decision relates to the weight given to Dr. Siddiqi's treating source opinion. (Docket no. 12 at 10). The ALJ gave the opinions contained in the April 7, 2014 medical source statement (AR 321-24) "little weight." (AR 32). Plaintiff argues that the ALJ's reasons for assigning this weight are not supported by the record, and that the ALJ did not have good reasons for affording Dr. Siddiqi's opinion less than controlling

weight. (Docket no. 12 at 10). In particular, plaintiff alleges that the ALJ erred by discrediting Dr. Siddiqi's opinion due to the frequency of her treatment and finding that Dr. Siddiqi's findings were internally inconsistent and inconsistent with other evidence in the record. (*Id.*).

The Social Security Administration defines a "treating source" as an acceptable medical source who provides, or has provided, "medical treatment or evaluation and who has, or has had, an ongoing treatment relationship" with the claimant. 20 C.F.R. § 404.1527(a)(2). An acceptable medical source includes licensed physicians, licensed or certified psychologists, and certain other specialists. 20 C.F.R. § 404.1502(a). The Commissioner generally affords more weight to a treating source's medical opinions "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of a claimant's medical impairments, and "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). The Commissioner gives a treating source controlling weight when that source's opinion regarding the nature and severity of the claimant's impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *Id.*

An ALJ is not required to give a treating source's opinion controlling weight "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence." *Craig*, 76 F.3d at 590 (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The ALJ is also not required to afford greater weight to a treating source's opinion simply because that source was one of a few individuals to treat the plaintiff. *See, e.g., Caudle v. Colvin*, No. 3:13-cv-091-JAG, 2013 WL 5874622, at *10-14 (E.D. Va. Oct. 30, 2013) (rejecting

the argument that the physicians' "opinion[s] should have been given greater weight by the ALJ, because [they were each] one of only three individuals to treat Plaintiff."). If the ALJ gives the treating source's medical opinion less than controlling weight, the ALJ must consider factors enumerated in the regulations and must provide good reasons for the weight given to that opinion. 20 C.F.R. § 1527(c)(2). These include (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the source's opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the source is a specialist about the medical issues; and (6) any other factors the claimant brings to the ALJ's attention or of which the ALJ is aware that supports or contradicts the medical opinion. 20 C.F.R. § 404.1527(c)(2)-(6). Courts generally will not disturb an ALJ's decision to afford a particular weight to a medical opinion "absent some indication that the ALJ dredged up 'specious inconsistences'" or failed to sufficiently explain that weight afforded to that opinion. *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)).

### 1. The ALJ properly considered the frequency of Dr. Siddiqi's treatment.

First, plaintiff argues that the ALJ's reliance on the frequency of the treatment is inconsistent with the regulations because no other doctors who provided medical opinions had seen plaintiff more than once, yet the ALJ discredited only Dr. Siddiqi's opinions based on frequency of plaintiff's treatment. (Docket no. 12 at 12). The Commissioner argues that this weight was appropriate because the regulations state generally that the Commissioner will give a treating source's opinion more weight the more times the source saw the treatment, but that "two

visits during the relevant period is hardly a significant number of times."[13]  (Docket no. 14 at

21).  The Commissioner further argues that no authority requires the ALJ to give the doctor who

saw plaintiff the greatest number of times significant weight.  (*Id.*).  Plaintiff replies that there is

no dispute that Dr. Siddiqi treated plaintiff on more occasions than any source, so it was legally

incorrect under the regulations for the ALJ to rely on Dr. Siddiqi's treatment relationship as a

good reason to afford her opinion less weight.  (Docket no. 18 at 1).

The ALJ discussed four medical opinions regarding plaintiff's medical and cognitive

limitations—the opinions of two state agency psychological consultants, Dr. Siddiqi, and Dr.

Weinberg.  (AR 32).  The ALJ did not reject Dr. Siddiqi's opinion completely, instead assigning

it "little weight" because "the record as a whole does not support the debilitating effects of

anxiety opined by Dr. Siddiqi."  (*Id.*).  In fact, the ALJ incorporated some mental limitations into

the residual functional capacity "to accommodate the claimant's cognitive deficits."  (*Id.*).  Of

the four sources providing opinions, Dr. Siddiqi saw plaintiff most frequently, and because no

other source saw him more than once, only Dr. Siddiqi could even arguably be considered a

treating source with an ongoing treatment relationship who could "provide a detailed,

longitudinal picture" of plaintiff's medical impairments.  § 404.1527(a)(2), (c)(2).  Because the

ALJ did not afford Dr. Siddiqi's opinion "controlling weight," the ALJ provided a detailed

narrative description of her reason for affording Dr. Siddiqi's opinion little weight consistent

with the regulations.  § 404.1527(c)(2).  Among those factors, the ALJ was required to, and did,

consider and note the length of the treatment relationship and the frequency of examinations.  §

404.1527(c)(2)(i).  Therefore, the ALJ did not err in considering that relationship.  Further, the

---

[13] It appears from the records that Dr. Siddiqi spent 35 minutes with the plaintiff on February 28, 2014 (AR 388) and 15 minutes with the plaintiff on March 2, 2014 (AR 393).  Neither visit included any formal cognitive testing.  (AR 388, 392).

fact that Dr. Siddiqi examined plaintiff more times than the other medical sources who provided medical opinions is unavailing given she still had a limited treatment relationship that would not give a "detailed, longitudinal picture." *Cf. Russell v. Comm'r of Soc. Sec.*, 440 Fed. App'x 163, 164 (4th Cir. 2011) (per curiam) (concluding the ALJ did not err in discounting the opinion of a treating source who the plaintiff saw "infrequently," who had not seen the plaintiff for six months prior to filling out his disability assessment, and whose treatment notes were inconsistent with the medical record). Therefore, although Dr. Siddiqi saw plaintiff more than the other sources, the ALJ was not required to consider that fact in plaintiff's favor.

Further, the ALJ did not discount the weight of Dr. Siddiqi's opinion simply because of the length and frequency of their treatment relationship. Instead, the ALJ focused the majority of her narrative on the inconsistencies between Dr. Siddiqi's opinions and the record, which, for the reasons stated below, support the weight the ALJ assigned to Dr. Siddiqi's opinion. (AR 32). Accordingly, the ALJ did not err in her consideration of the frequency of Dr. Siddiqi's treatment.

### 2. The ALJ's determination that Dr. Siddiqi's opinion is internally inconsistent is supported by substantial evidence.

Second, plaintiff argues that the ALJ's allegation that Dr. Siddiqi's opinion is internally inconsistent is not supported by substantial evidence. (Docket no. 12 at 12). Specifically, plaintiff argues that the symptoms listed in the treatment notes, which include "irritability, blacking out, memory problems, poor focus, tearful episodes, anxiety, impaired attention, and frequently zoning out," match the symptoms listed in the questionnaire. (*Id.*). The Commissioner responds that Dr. Siddiqi's treatment notes for both visits show "that Plaintiff was alert, logical, cooperative, neatly dressed, and not overtly manic or psychotic" and had adequate cognition, demonstrating that the ALJ had good reason to afford Dr. Siddiqi's opinion little weight. (Docket no. 14 at 21-22). Furthermore, the April 7, 2014 statement does not reflect the

significant improvements in plaintiff's condition noted in the records from Dr. Siddiqi's March 24, 2014 examination. (AR 392-96). Plaintiff replies that the Commissioner simply reiterated what the ALJ said in her decision instead of directly responding to plaintiff's arguments. (Docket no. 18 at 2).

This court is bound by the substantial evidence standard and is not tasked with re-weighing conflicting evidence in the record. *Mastro*, 270 F.3d at 176. Not all the evidence in the record must support the ALJ's decision; it need only be enough evidence "as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence supports the ALJ's conclusion that the opinions in the medical source statement were inconsistent with Dr. Siddiqi's objective findings, particularly in light of the improvement noted following plaintiff being placed on psychiatric medications.

On both October 8, 2012 and December 10, 2012, before the alleged onset date, Dr. Siddiqi observed that plaintiff had an "intact attention span and concentration," that his memory was intact, that he was intellectually average, and that his insight and judgment were good. (AR 326, 332). On February 28, 2014, plaintiff's first visit to Dr. Siddiqi since the alleged onset date, plaintiff did appear to be anxious and tearful with somewhat impaired attention, but he was also documented as "cooperative, neatly dressed, and not overtly manic or psychotic." (AR 337). Although that visit appears somewhat consistent with Dr. Siddiqi's conclusions on its own, the ALJ's opinion noted that Dr. Siddiqi changed plaintiff's medications, resulting in an improvement in those symptoms. (AR 30). Indeed, on March 24, 2014, plaintiff was alert, calm, logical, and cooperative, and plaintiff reported improved anxiety and frustration tolerance, though he did report feeling "transient panic from situational stressor[s]." (AR 392-93). Dr.

Siddiqi documented that plaintiff had "adequate appearing cognition," but she did not formally

test it. (AR 392). Though the record does not indicate that plaintiff was free from cognitive

difficulties, it is consistent with the ALJ's conclusion that Dr. Siddiqi's opinion deserved some

weight, but that her own notes did not support a finding of debilitating anxiety.

Plaintiff also faults the Commissioner for restating the evidence cited by the ALJ (Docket

no. 18 at 2), but the record contains a limited number of treatment notes since the alleged onset

set, and the ALJ considered those notes when deciding what weight to assign Dr. Siddiqi's

opinion. (AR 32). Therefore, the undersigned recommends a finding that substantial evidence

supports the ALJ's conclusion that Dr. Siddiqi's opinion was inconsistent with her own treatment

notes.

> 3.  *The ALJ's determination that Dr. Siddiqi's opinion is inconsistent with other evidence in the record is also supported by substantial evidence.*

Third, plaintiff argues that the diagnoses of other doctors, specifically Ms. Prakash, Dr.

Starkie, Dr. Shamim, and Dr. Weinberg, all support Dr. Siddiqi's opinion. (Docket no. 12 at 12-

13). The Commissioner points to a number of findings by other doctors in the medical record

that the ALJ discussed to refute this position, such as Dr. Weinberg's findings that plaintiff had

minimal depression, mild anxiety, "'superior' performance on working memory tasks[,] and

intact performance on executive functioning tasks," and Dr. Shamim's February 2017 evaluation

that revealed a largely normal mental status examination. (Docket no. 14 at 22). The

Commissioner asserts that plaintiff has mischaracterized the evidence by failing to note that Dr.

Starkie found that the results of a test consistent with dementia was inconsistent with plaintiff's

presentation otherwise, and that plaintiff relies in part on plaintiff's reported complaints to Dr.

Shamim, not on Dr. Shamim's objective findings. (*Id.* at 23). The Commissioner also argues

that the ALJ's findings are entitled to great deference. (*Id.*). Plaintiff replies that the record is

consistent with Dr. Siddiqi's opinions, restating the evidence raised in his memorandum in support and arguing that both Dr. Siddiqi and Dr. Weinberg "found that Mr. McNiff suffer[s] from greater functional restrictions than accounted for by the ALJ." [14]   (Docket no. 18 at 2).

Again, this court is bound by the substantial evidence standard, and not all evidence in the record must conflict with Dr. Siddiqi's opinion to establish that substantial evidence supports the ALJ's position that the opinion is inconsistent with the record as a whole.  *Mastro*, 270 F.3d at 176; *Richardson*, 402 U.S. at 401.  Moreover, the evidence plaintiff contends contradicts the ALJ's findings does not support his position.  Plaintiff relies on Ms. Prakash's cognitive disorder diagnosis (Docket no. 12 at 12), but as noted in the ALJ's opinion, plaintiff's mental status examination revealed attention and concentration within normal limits, and the documented memory deficits in the record were drawn from plaintiff's subjective complaints, not Ms. Prakash's objective observations. (AR 31, 805).  Further, although Dr. Starkie did conclude that plaintiff's MOCA score was in a range consistent with moderate dementia, plaintiff fails to note that Dr. Starkie observed that this finding was not consistent with plaintiff's presentation otherwise.  (AR 864).  However, the ALJ noted and considered that fact in her opinion.  (AR 31). Plaintiff also argues that Dr. Shamim "reported problems with memory, psychomotor slowing, poor concentration, and depression and anxiety" (Docket no. 12 at 12).  Plaintiff's description of Dr. Shamim's findings refer to plaintiff's reported difficulties, not the results of Dr. Shamim's observations or testing.  (AR 854).  In fact, Dr. Shamim documented that plaintiff was "[a]lert, logical, calm, neatly dressed, . . . [and had] normal speech." (AR 855).  Although plaintiff reported a history of memory problems, Dr. Shamim did not formally test his cognition but indicated it was "adequate appearing." (*Id.*).

---

[14] Plaintiff continues to characterize Dr. Weinberg as the "Social Security's own examining doctor" in his reply (Docket no. 18 at 2), but he still has not pointed to any evidence establishing that relationship.

Plaintiff similarly overstates Dr. Weinberg's recitation of plaintiff's symptoms (Docket no. 12 at 12-13), failing to note that that description was associated with a "minimal" Beck Depression Inventory, that Dr. Weinberg opined that "performance was essentially in the expected range of functioning," that despite some difficulties "he exhibited intact skills across the remainder of cognitive domains," and that she did not conclude that plaintiff presented with early onset dementia. (AR 552-53, 560). Plaintiff seemingly characterizes Dr. Weinberg's recommendations as steps that plaintiff must follow in order to return to work, but the recommendations are reasonably read as a non-exhaustive list of suggested strategies to compensate for his reported difficulties. (AR 554). Plaintiff correctly states that Dr. Weinberg opined that plaintiff may have difficulty making decisions or may become stressed by changes in his routine (Docket no. 12 at 13; AR 560), but that finding alone does not overcome the substantial evidence supporting the ALJ's decision, especially in light of her decision to assess some mental limitations to accommodate plaintiff's cognitive deficits and her finding that Dr. Siddiqi's opinion did not support the opinion that plaintiff's anxiety had "debilitating effects." (AR 32). Moreover, the ALJ's opinion provides a thorough and accurate description of the medical record, detailing plaintiff's history of largely normal neurological testing and evaluations by not only the providers named in plaintiff's motion, but also other medical sources included in the record. (AR 30-32). Accordingly, the undersigned recommends a finding that the ALJ provided good reasons for according less than controlling weight to Dr. Siddiqi's treating source opinion, and that her decision is supported by substantial evidence.

## IV.   CONCLUSION

Based on the foregoing, it is recommended that the court finds that the Commissioner's final decision, denying benefits for the period of August 19, 2013 through the date of the

46

decision, is supported by substantial evidence and that the proper legal standards were applied in evaluating the evidence.  Accordingly, the undersigned recommends that plaintiff's motion for summary judgment (Docket no. 11) be denied, the Commissioner's motion for summary judgment (Docket no. 15) be granted, and the final decision of the Commissioner be affirmed.

**NOTICE**

Failure to file written objections to this report and recommendation within 14 days after being served with a copy of this report and recommendation may result in the waiver of any right to a *de novo* review of this report and recommendation and such failure shall bar you from attacking on appeal any finding or conclusion accepted and adopted by the District Judge except upon grounds of plain error.

Entered this 4th day of June, 2019.

_____/s/_____
John F. Anderson
United States Magistrate Judge
United States Magistrate Judge

Alexandria, Virginia